Draeger Safety Diagnostics, Inc.

12. <u>Ownership of Interlock Devices and Client Leases.</u> Every device provided by Draeger is owned by, and shall remain the sole and exclusive property of Draeger. Every Client "Equipment Lease Agreement" signed on behalf of Draeger is owned and shall remain the sole and exclusive property of Draeger. DASP shall not, directly or indirectly, encumber or otherwise impair Draeger's title to the device or Client Equipment Lease. Draeger warrants that it is not prohibited from delivering devices to DASP. Draeger further warrants that Draeger Safety Diagnostics, Inc., is a corporation in good standing.

13. <u>Warranty.</u> Draeger's warranties for any devices installed, serviced, maintained or repaired under this Agreement are specifically limited according to the terms of paragraph 5. j. of this Agreement. Further:

> Draeger shall not be liable for damage due to automobile collision, fire, misuse, abuse, or device tampering or for any other costs due to failures caused by failure to abide by the manufacturers' instructions on installation and use of the device, or by the improper installation or improper use of the devices. Draeger shall not be liable for any indirect, incidental, consequential or special damages from or occasioned by the devices, except as provided for by law in jurisdictions where such disclaimers are not valid.
>
> DRAEGER MAKES NO EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THE INTERLOCK DEVICES OR THE TRAINING, PARTS OR SERVICES PROVIDED BY DRAEGER IN CONNECTION WITH THOSE DEVICES OTHER THAN THE WARRANTIES DESCRIBED HEREIN. DRAEGER EXPRESSLY DISCLAIMS ANY AND ALL OTHER WARRANTIES AND IN NO EVENT SHALL DRAEGER BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES. IN ADDITION, IN NO EVENT SHALL DRAEGER'S LIABILITY WITH RESPECT TO ANY CLAIM, WHETHER IN CONTRACT, TORT, OR OTHERWISE, FOR ANY LOSSES OR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE MANUFACTURE, DELIVERY, SALE, RESALE, OR OTHER USE OF ANY DRAEGER INTERLOCK DEVICE, TRAINING, PART OR SERVICE EXCEED THE PRICE PAID BY DASP FOR THE DEVICE, TRAINING, PART OR SERVICE GIVING RISE TO THE CLAIM.

14. <u>Indemnification.</u> DASP agrees to indemnify and to hold harmless Draeger, its officers, agents and employees, and their successors and assigns, in respect to all causes of action, claims, demands, liabilities, loss, damage, actions, litigation, or other expenses, including Attorney fees and costs, which may arise as a result of any action or omission by DASP or its officers, agents, or employees.

15. <u>Arbitration.</u> Any dispute arising under, out of, in connection with, or in relation to this Agreement, or any breach hereof, shall be determined and settled by arbitration held in Dallas, Texas, pursuant to the Commercial Arbitration Rules (including the Optional Rules for Emergency Measures of Protection) of the American Arbitration Association (AAA). The

Draeger Safety Diagnostics, Inc.

arbitration shall consist of one arbitrator. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

16. Notice. Any notice required or permitted by this Agreement shall be delivered in person or sent by facsimile transmission, with a confirmation copy sent by first class mail in the U.S. Mail, with sufficient postage attached. Such notice shall be effective upon personal delivery or upon facsimile transmission. All notices shall be addressed to the appropriate party as follows:

If to Draeger:

George Ballance, President and CEO
Draeger Safety Diagnostics, Inc.
4040 W. Royal Lane, Suite 136
Irving, TX 75063

If to DASP:

Paul Dewey, Owner
New Horizon Interlock, Inc.
29234 Lyon Oaks Drive
Wixom, MI 48393

or to such other person and address which either party might designate from time to time, in writing.

17. Confidentiality. DASP and Draeger acknowledge that each may come into contact with confidential information. The confidentiality of any information shall be respected, and no confidential information will be passed to any third party or used by DASP or Draeger in any way except as authorized by the State and by this Agreement, nor be retained in any files of DASP or Draeger. In addition, each party acknowledges that the other will come into possession of the technical or software protocols and product of the other party, and each agrees to keep such information confidential and not to use or to disseminate the information to any party without the written consent of the other party being first obtained. DASP will not disclose any item regarding the parties' business arrangement without the express written permission of Draeger, unless otherwise required by a court of competent jurisdiction or by law.

18. Discrimination and Affirmative Action. Draeger is committed to a nondiscriminatory policy with regard to employees and applicants. These decisions are made without regard to race, color, religion, national origin, age, sex, veteran status, or physical or mental disability of an otherwise qualified person. All Draeger subcontractors or DASP's are required to comply with this same standard of commitment.

19. Governing Law; Jurisdiction. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Texas, without giving effect to principles of conflicts of law. Any disputes arising under this agreement are subject to binding arbitration through the American Arbitration Association or other mutually agreed nationally recognized arbitration

Draeger Safety Diagnostics, Inc.

service located in the State of Texas. For the purpose of this provision, the arbitrator shall determine which, if any, party is deemed to be the prevailing party.

20. Miscellaneous.

a. Entire Agreement. This instrument contains the entire Agreement of the parties and no representations, inducements, promises, or Agreements, oral or otherwise, not embodied herein shall be of any force and effect.

b. Amendments. This Agreement may not be amended or modified except by a writing signed by the parties hereto.

c. Invalidity. Should any part of this Agreement for any reason be declared invalid, such decision shall not affect, the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

d. Binding Effect. Except as this Agreement expressly provides to the contrary, this Agreement will inure to the benefit of and be binding upon the heirs and successors of the parties.

e. No Waiver. Any breach, default, or failure to perform any term or condition of this Agreement shall not be deemed waived or released by a party's silence, and any such waiver or release shall not be effective unless made in writing by an authorized representative of the party making the waiver. The waiver of any term or provision of this Agreement shall not constitute waiver of a future breach, default or failure to perform for the waived provision, unless expressly provided in the written waiver. The waiver of any term or provision of this Agreement shall not constitute waiver of any other term or provision of this Agreement not specifically addressed in the written waiver.

f. Section Headings. The section headings or titles are for convenience only and shall have no substantive effect in the interpretation of this Agreement.

g. Use of Name: Draeger grants the DASP a personal consent to use the marks DRAEGER and DRAEGER INTERLOCK in a factual way in advertising materials to the extent necessary to indicate that DASP is an authorized DASP for the Draeger Interlock product(s) at addresses listed in Exhibit B of this Agreement. All such materials must clearly display the following trademark notice: "DRAEGER and DRAEGER INTERLOCK$^®$ are trademarks owned by Draeger Safety, Inc. and are used by permission." DASP shall not use DRAEGER or DRAEGER INTERLOCK$^®$ in a trademark fashion without the prior, written permission of Draeger. DASP shall not use any other mark(s) in connection with promoting the Draeger products or the services described in this Agreement without the prior, written permission of Draeger; for the sake of clarity, DASP's use of its own trade name shall not be considered to violate this restriction.

h. Force Majeure. Neither DASP nor Draeger shall be liable to the other for any delay in, or failure of performance of, any covenant or promise contained in this contract, nor shall any delay or failure constitute default or give rise to any liability for damages if, and only to the

Initials ___   5/29/2008

Draeger Safety Diagnostics, Inc.

extent that, such delay or failure is caused by force majeure. As used in this Agreement, 'force majeure' means fire, explosion, action of the elements not already considered by the applicable state certification process as it applies to ignition interlock devices (it being the intent to require the devices to operate as required under the applicable state certification and device operating protocols notwithstanding the elements to which the device might be subjected), strike, interruption of transportation, rationing, court action, illegality, or any other cause which is beyond the control of the party affected and which, by the exercise of reasonable diligence, could not have been prevented by the party affected.

i.  <u>Authority to Execute</u>. Each party hereby warrants and assures and guarantees to the other party that it possesses the legal authority to enter into this Agreement. The persons signing this Agreement for each party warrant and represents that they have full right, power and authority to execute this Agreement on behalf of his respective party.

21. <u>Definitions</u>.  In this Agreement, these terms will have the, following definitions:

a.  "As needed" shall mean equipment of a proprietary or exclusive use nature needed by DASP technicians to service, install, or otherwise facilitate the administration of each service facility, or by other DASP management personnel, as agreed upon by both parties.

b.  Certification or "certified," or "certified device" means that the manufacturer or the DASP of the device has actually received written permission, according to law or rules and regulations, to distribute, install, service, and otherwise make available a device to the public, and that this written permission has been received from that agency in any respective State that is charged with the responsibility for granting or denying such permission or certification.

c.  "Customer" is defined as any state or federal authority in cases wherein Draeger is a provider of interlock services under a contract.

d.  "Client" is defined as any individual person using Draeger interlock devices or interlock services.

e.  "Establish interlock facilities," or "establishes an interlock service location" will mean that the DASP has actually opened a place of business with the equipment and personnel required to staff and maintain the same.

f.  "Misuse" shall mean damage or loss resulting from misuse, abuse, accident, neglect, improper installation, improper maintenance or use, or mechanical, electrical, vehicle fire or environmental circumstances such as corrosion to parts of the device.

g.  "Written notice" may consist of a writing that is mailed, first class mail, postage prepaid, a writing that is sent by facsimile, or a writing that is hand-delivered writing.

Initials _____    5/29/2008

Draeger Safety Diagnostics, Inc.

## ATTACHMENTS TO DRAEGER AUTHORIZED SERVICE PROVIDER AGREEMENT BETWEEN DRAEGER SAFETY DIAGNOSTICS, INC. AND NEW HORIZON INTERLOCK, INC.

### Exhibit A – Preventive Maintenance

- verify wire harness length prior to installation - minimum length 14"
- verify wire harness length after removal - minimum length 14"
- clean and inspect handset and control box prior to installation
- clean and inspect handset and control box after removal
- send all equipment out of specification back to Draeger for repair

### Exhibit B – Service Locations and Hours of Operation

The service address(s) including days and hours of available service in this Agreement are as follows:
Service Locations:  Multiple throughout Michigan and Wisconsin.
Main location located at:
29234 Lyon Oaks Drive
Wixom, MI 48393

Hours of Operation:

Monday:  Varies by location.

Tuesday:  Varies by location.

Wednesday:  Varies by location.

Thursday:  Varies by location.

Friday:  Varies by location.

Saturday:  Varies by location.

Sunday:  Varies by location.

### Exhibit C – Standard Fees and Charges

Installation:

De-Installation:

Change Vehicle:

Calibration/Monitor Check:

Violation Re-Set:

Road Service:

Missed Appointment:

Bad Check:

Multiple vehicles:

Economic Hardship:

Initials

5/29/2008

# EXHIBIT B

**Pepper Hamilton LLP**
——Attorneys at Law——

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

A. Christopher Young
direct dial: 215.981.4190
youngac@pepperlaw.com

January 18, 2011

*Via Facsimile (1-877-304-8457) and First Class Mail*

American Arbitration Association
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043

Re:   <u>Draeger Safety Diagnostics, Inc. v. New Horizon Interlock, Inc.</u>,
Case No. 50117T1711

To Whom It May Concern:

I represent Claimant Draeger Safety Diagnostics, Inc. ("Draeger") in the above captioned matter and write to request the appointment of an emergency arbitrator. The parties consented to the rules for emergency measures of protection in Section 15 of the contract, attached hereto as Exhibit A. A Demand for Arbitration was filed on January 11, 2011 alleging Respondent New Horizon Interlock, Inc. ("New Horizon") breached its contract with Draeger by failing to pay lease fees, failing to return Draeger client records, electronic data and other reports, removing Draeger owned equipment from client vehicles and disclosing confidential information to third parties. An administrative conference call is currently scheduled for January 24, 2011. However, emergency relief is now required to compel New Horizon to return certain records and data to Draeger so that it can comply with statutory obligations it has with the State of Michigan.

Draeger manufactures, among other products, the Dräger Interlock XT, a breath alcohol ignition interlock device ("BAIID") that, when placed in a motor vehicle, can prevent the vehicle from being started if the driver's breath alcohol concentration is higher than the state's limit. Many States, including Michigan, require drivers who have been convicted of driving a motor vehicle under the influence of alcohol to install interlock devices on their motor vehicles for a period of time. Michigan's Department of State certified Draeger as a manufacturer of interlock devices, allowing it to install and service its devices in motor vehicles in Michigan and collect data regarding, among other things, violations related to the interlock device and report those violations back to the Department of State. In order to carry out its obligations as a certified manufacturer of interlock devices, Draeger contracts with service providers to install

**Pepper Hamilton LLP**
Attorneys at Law

American Arbitration Association
Page 2
January 18, 2011

Dräger Interlock devices and collect the data Draegar needs to comply with its reporting obligations.

On May 29, 2008, Draeger entered into a Draeger Authorized Service Provider Agreement ("Agreement") with New Horizon in order for New Horizon to became a Draeger Authorized Service Provider ("DASP") within Michigan. Pursuant to the Agreement, New Horizon was responsible for installing, calibrating, and otherwise servicing Dräger Interlock devices. More importantly, New Horizon was obligated to collect data and information regarding the devices and transmit that information to Draeger so that Draeger can comply with its reporting obligations to Michigan's Department of State. See Mich. Admin. Code R. 257.313a(4) and (5). Upon termination of the Agreement, New Horizon was responsible for returning all records, electronic data, and reports associated with the Interlock devices and the customers who leased the interlock devices. See Exhibit A, *Agreement*, at § 3.c. The records, data and reports are the property of Draeger. Id.

On May 26, 2010, Draeger notified New Horizon that it would not be renewing the Agreement upon its expiration on June 30, 2010. See Exhibit B, *Notice dated May 26, 2010*. However, Draeger and New Horizon executed an Amendment to the Agreement extending the expiration date until December 31, 2010. See Exhibit C, *Amendment*, § 1.

On December 28, 2010, in accordance with the termination of New Horizon as a DASP, Draeger advised New Horizon that Draeger employees would visit New Horizon's facility on January 6, 2011 in order to pick up Draeger's devices and obtain all client records, electronic data, and reports. See Exhibit D, *Letter dated December 28, 2010*. On January 6, 2011, a Draeger employee retrieved Draeger's devices, but New Horizon did not turn over any client records, data, or other reports. On January 12, 2011, I advised William Foren, Esquire, counsel for New Horizon, that New Horizon had not yet turned over the requested materials and reiterated Draeger's demand for the client records, data, and other records. See Exhibit E, *Letter dated January 12, 2011*. As of today, I have not received any response to this request. Draeger also made numerous attempts to contact William Foren by telephone, but to no avail. As such, I certify that New Horizon and its representative have been notified of this request for customer records on numerous occasions and it has not complied.

Draegar now requests the appointment of an emergency arbitrator to order New Horizon to immediately return to Draeger the complete customer records, electronic data and reports as required by Section 3.c. of the Agreement. This relief is needed on an emergency basis because Draeger is responsible for reporting this information to the State of Michigan pursuant to its statutory reporting and monitoring obligations. Without the complete customer records, Draeger is unable to perform its obligations with the State of Michigan and risks being terminated as a certified manufacturer of interlock devices in Michigan. See Mich. Admin. Code

Pepper Hamilton LLP
Attorneys at Law

American Arbitration Association
Page 3
January 18, 2011

R. 257.1005(1)(b) ("[t]he administrator may remove a manufacturer from the list of manufacturers of approved certified BAIIDs for either of the following reasons:…(b) [t]he manufacturer or the installers and service providers authorized to install and service the manufacturer's BAIID fail to submit reports required by the act or rules promulgated to implement the act ….in a timely manner.") As such, Draeger is entitled to such relief because it will suffer immediate and irreparable harm if the records are not immediately returned. As the records, data and reports are the property of Draeger, there can be no rational basis for New Horizon to retain the data (the Agreement permits it to retain copies) or refuse to return it to Draeger.

This request is simultaneously being faxed and mailed to New Horizon's last known business address, as well as its representative, William Foren, Esquire. Thank you for your prompt consideration of this matter.

Sincerely,

A. Christopher Young

Enclosures

ACY:jll

cc:   New Horizon Interlock, Inc. (via facsimile and first class mail)
      William Foren, Esquire (via facsimile and first class mail)

# EXHIBIT A



Draeger Safety Diagnostics, Inc.

# Draeger Authorized Service Provider Agreement

This Agreement is entered into by Draeger Safety Diagnostics, Inc., (hereinafter referred to as "Draeger"), whose address is 4040 W. Royal Lane, Suite 136, Irving, TX 75063 and New Horizon Interlock, Inc., (hereinafter referred to as "DASP"), whose address is 29234 Lyon Oaks Drive, Wixom, MI 48393.

*Whereas*, Draeger is the manufacturer and Lessor of Draeger products (hereinafter known as "device(s)," "Draeger Interlock devices," "interlock[s]," or "ignition interlock[s]") designed for use in motor vehicles. Draeger is responsible for all service, maintenance and upgrade described in this Agreement (including firmware, software associated with the performance of the ignition interlock device which is the subject of this Agreement and hardware repairs and changes that are required to meet the need of the market and the customers and Clients therein from time to time) and continuing research, design, and development of such equipment.

*Whereas*, Draeger shall retain responsibility for reporting all Client compliance and non-compliance to the appropriate governing agency. In addition, Draeger shall strive to increase utilization of ignition interlock technology through marketing and business development efforts.

*Whereas*, Draeger, as manufacturer and Lessor of such devices, seeks an authorized Service Provider (hereinafter referred to as the "DASP") to provide field services consistent with Draeger standards of quality that include (but are not limited to) the installation, periodic calibration, and authorized removal of the Draeger Interlock device(s), and any future ignition interlock device(s) that might be developed by Draeger as part of continued responsibilities that it has for research and development of newer interlock devices (the "devices").

*Whereas*, DASP desires to be authorized to install, inspect, calibrate, and de-install the Draeger Interlock device(s) upon the terms and conditions set forth below.

NOW THEREFORE, THE PREMISES CONSIDERED THE PARTIES AGREE AS FOLLOWS:

1. <u>Appointment as DASP</u>. Draeger hereby appoints DASP to be Draeger's authorized Service Provider to Draeger Clients (equipment Lessees) in order to provide the services listed herein at the address or addresses listed in Exhibit A. DASP agrees to abide by the terms and conditions as set forth herein, assure that all service technicians it employs for the purposes of installing and maintaining Draeger Interlock devices are trained to Draeger standards, and provide the following services on such devices:

   a. installs/de-installs the devices as required on Draeger's Clients automobiles or other means of conveyance, as well as safety sensitive workplaces that might require the use of a device, and

Initials *BB* *TF*

5/29/2008

Draeger Safety Diagnostics, Inc.

b. provides calibration services of the devices as required by such equipment or by agreement with Judicial or Governmental agencies, and

c. collects electronic data from the device and Client program information to be transferred to Draeger at times and by means designated by Draeger. Draeger shall retain responsibility for dissemination of Client data to appropriate authorities, and

d. is responsible for the cost and expense to establish and maintain DASP facilities and trained service technicians.

2. <u>Term.</u> The term of this Agreement shall commence on July 1, 2008, and continue through June 30, 2010, unless sooner terminated pursuant to Paragraph 3. This Agreement shall automatically renew for an additional 1-year increment thereafter unless either party gives 30 days written notice to the other of its intent not to renew.

3. <u>Termination by Draeger or DASP.</u>

a. This Agreement may be terminated prior to the expiration of its term by Draeger or DASP upon the occurrence of any of the following events, each of which will be deemed a default hereunder.

   i. Immediately, upon any material breach of this Agreement (a material breach is defined as (a) a failure to timely pay invoices or meet other payment obligations; (b) a breach of Paragraph 4, 7, 8, 17, or 20(g) of this Agreement; (c) any failure to comply with any provision of this Agreement that is not cured within the cure period set forth in subsection 3.a.ii. below; or (d) any act found to involve fraud or misrepresentation by a party or by any conviction of a criminal act in any state by the other party); or

   ii. Upon thirty (30) days written notice to DASP of any breach or failure of performance by DASP of any provision of this Agreement, or failure to perform an obligation within the time period prescribed which is not cured within a thirty (30) day period following the notice of breach or failure of performance; or

   iii. Immediately, if DASP or Draeger becomes insolvent or makes a general assignment for the benefit of creditors, or to an agent authorized to liquidate its property or assets; or becomes bankrupt, or voluntarily files a petition in bankruptcy, or has a voluntary petition in bankruptcy filed against it; or suffers the appointment of a receiver of any of its assets and property; or upon the dissolution or liquidation of DASP or Draeger; or

   iv. Immediately, if a governmental or judicial entity prohibits interlock Clients from obtaining service from DASP; or

   v. Immediately, if there is consequential change in the number of days or hours available to Draeger Clients for service as recorded in Exhibit B of this Agreement.

Initials

5/29/2008

Draeger Safety Diagnostics, Inc.

b.  In the event of such cancellation, termination or expiration of this Agreement, or in the event that Draeger or DASP provides written notice of a breach of this Agreement, DASP shall not remove any device from a Client vehicle without written approval from Draeger. Further, should DASP be directed by Draeger or any legislative or other entity to which Draeger is contractually obligated to provide interlock services, to remove installed interlocks, such removal costs will be the responsibility of DASP.

c.  Within five (5) days of cancellation, termination or expiration of this Agreement, DASP shall return to Draeger all un-installed rented/leased devices and equipment in its possession, and turn over all records, electronic data, and reports relating to this Agreement. The parties expressly acknowledge and agree that such records, electronic data, and reports relating to the services provided pursuant to this Agreement are the property of Draeger; provided, however, that DASP may retain copies of such records, electronic data, and reports for the purpose of complying with statutory data or records retention obligations or for prosecuting or defending non-payment, default, or other claims relating to DASP services.

4.  Scope of Services by DASP. DASP will provide service at the address or addresses listed in Exhibit A. DASP will collect and transfer electronic records to Draeger as required by the respective referring agencies.

a.  Good and Workmanlike Manner. DASP shall perform all installations, calibrations, services, maintenance, repairs, and removals, under this Agreement in a good and workmanlike manner.

b.  Maintenance. DASP shall perform preventive maintenance not otherwise covered by Warranties on the devices to keep the devices in good working order (defined as meeting or exceeding Draeger's Quality Assurance Program for all interlock service providers), and shall provide all labor, tools and equipment required to correct any routine, non-warranty problem with the device. Draeger's current Preventive Maintenance Schedule is attached hereto as Exhibit B.

c.  Routine Records. DASP shall transmit to Draeger electronic Client records including device data, according to the terms and conditions specified by Draeger or the respective state administrative or judicial programs. Draeger shall be responsible for providing required reports and information to governing authorities.

d.  Phone and Internet Service. DASP shall provide phone and/or Internet service to adequately facilitate day-to-day operations, or as specifically outlined by a state or jurisdiction, continuously throughout the life of this Agreement. Governmentally required toll-free phone service that might be required by such authorities shall be provided by Draeger.

e.  Service Response. DASP must respond to all referrals by Draeger or any Jurisdiction to potential Clients within 48 hours of notification thereof. DASP must as soon as practicable provide maintenance service for Devices in the event that a Device calls for "SERVICE REQUIRED" or is malfunctioning. DASP must use reasonable efforts to prevent a Client from operating a motor vehicle without a functioning Device. In the event that a motor

Draeger Safety Diagnostics, Inc.

vehicle has been driven by a Client without an operating Device, DASP must notify Draeger immediately. Draeger shall be responsible for notifying the proper authorities as required.

f. <u>Service Accessibility</u>. Work hours expended and the number of locations and technicians employed to provide services must be sufficient to meet or exceed each Jurisdiction's applicable requirements.

g. <u>Service Days and Hours</u>. DASP service location or locations shall be open and available to Draeger Clients for service according to the days and hours listed in Exhibit B of this Agreement. Draeger must approve any permanent change in days or hours of service that would decrease the availability of service.

h. <u>Requirement for Technician Certification</u>. The parties agree that where states or local governmental authorities require the certification of interlock service technicians or service facilities, the responsibility and any cost for obtaining such certification shall rest with the DASP.

i. <u>Cost Collection</u>. DASP shall collect and remit to the appropriate government authorities all taxes or fees required for their program of service work in accordance with applicable Federal, State and Local laws or regulations. DASP shall make available annually to Draeger any and all documentation regarding payment of applicable taxes and/or fees required collected and/or paid under this section.

j. <u>DASP Compensation/ Fees from Draeger Clients</u>. DASP may charge and retain other fees due from Draeger Clients. Such fees may include, but not be limited to, "installation fees", "de-installation fees", "change vehicle fees", "late appointment fees", "road service fees", "violation reset fees", or other reasonable fees assessed by the DASP. DASP will provide notification to Draeger when making changes to DASP's standard fees outlined in Exhibit C.

k. <u>Service Fees and Fee Collection</u>. DASP shall be solely responsible for the collection of any and all fees, taxes, filing fees (if any are applicable) and any other costs that it is entitled to collect/charge, and will hold Draeger harmless for the collection of such fees.

l. <u>Draeger Clients Lease Fees, Loss/Damage Fees, Fee Collection, and Payments</u>. DASP shall be responsible for the collection of all Clients lease fees, applicable tax, and loss/damage fees. DASP shall be provided a monthly statement of fees payable to Draeger, and shall be responsible for payment of all fees to Draeger regardless of whether DASP has collected applicable fees. Fees shall be in the following amounts:

   1. Equipment lease: $27.00 per month for XT interlock devices and $27.00 per month for IL-920 interlock devices.
   2. Tax: Pursuant to local tax regulations.
   3. Terms: Net 30 days.

For payments more than 30 days past due, Draeger may place DASP's account on hold and may, in addition to any other remedies Draeger deems appropriate, including termination of this agreement, withholding shipments of new Devices, warranty repaired Devices, or supplies and accessories until the account is paid in full.

Initials _____     5/29/2008

Draeger Safety Diagnostics, Inc.

m. <u>Replacement Costs</u>. The price payable by DASP to Draeger for lost, stolen or destroyed Devices shall be $975.00 per Device. The price for each lost, stolen or destroyed handset component of a Device shall be $825.00 per Device. The price for lost, stolen or destroyed [I/O] components of Devices shall be $150.00 per Device. Replacement fees shall be subject to reasonable modification from time to time, upon prior written notice, to reflect relevant market conditions. DASP must promptly notify Draeger in writing of any lost, stolen or destroyed components or Devices and shall be responsible for any costs and expenses resulting from or related to lost, stolen or damaged Devices.

n. <u>Lost or Stolen Systems</u>. In the event a Client does not report for calibration/monitoring service within the specified "grace period", DASP shall be responsible for reporting this to Draeger. Draeger will notify the governing authority of the Client's breach of contract. DASP will make reasonable efforts to recover Draeger property.

o. <u>Background Investigations & Duty to notify</u>. DASP represents, warrants and agrees that with regard to self, any employee, or any person providing ignition interlock service in any capacity on behalf of DASP, DASP shall report to Draeger any arrest, criminal complaint, conviction, or other official criminal proceeding that DASP becomes aware of, either directly or indirectly, that involves the use of alcohol or drugs, or is in any way related to the qualifications, function, and duties related to the installation and inspection of the Device. Failure to report such to Draeger within two (2) business days shall be grounds for immediate termination of this contract. DASP agrees that said obligation is a material term of this Agreement. DASP further agrees that with regard to self, any employee, or any person providing ignition interlock service in any capacity on behalf of DASP, DASP shall terminate the employment of any person providing ignition interlock service who is the subject of arrest, criminal complaint, conviction, or other official criminal proceeding that DASP becomes aware of, that involves the use of alcohol or drugs, or is in any way related to the qualifications, function, and duties related to the installation and inspection of the Device. DASP agrees and understands that if required by local regulations, background checks must be conducted on all staff as required by law, rules, or regulations. The cost for such investigation shall be the responsibility of the DASP.

5. <u>Obligations of Draeger</u>

a. <u>Marketing & Promotion</u>. Draeger shall assist in the marketing and promotion of the Draeger system to any and all judicial, governmental, corporate or private entities.

b. <u>Judicial & Governmental Liaison</u>. Draeger shall be responsible for all contact with judicial or governmental authorities with regards to required reporting. DASP shall refer all calls concerning reporting from such authorities to Draeger's designated employee. DASP is responsible to liaison with judicial and governmental authorities with regards to referrals.

c. <u>Requirement for Device Certification</u>. The parties agree that where states or local governmental authorities require the certification of ignition interlock devices, the responsibility and any cost for obtaining such certification shall rest with Draeger.

Draeger Safety Diagnostics, Inc.

d. <u>Equipment and Stock</u>. The following shall be provided to DASP by Draeger at no cost on an as-needed basis (as defined in paragraph 20. a.); program software and brochures. DASP shall be responsible for the purchase of consumable mouthpieces, approved alcohol simulator, and certified alcohol solution, such items to be purchased from Draeger at Draeger's list price less 15% plus shipping.

e. <u>Stand-By Inventory</u>. Draeger will provide stand-by inventory at no cost to DASP, excluding shipping costs, by direct shipment utilizing ground transportation. Stand-by Inventory shall be provided based on the following chart:

| # of Units | | Shelf Stock |
|---|---|---|
| 1 | - 50 | 2 |
| 51 | - 100 | 3 |
| 101 | - 150 | 4 |
| 151 | - 200 | 5 |
| 201 | - 250 | 6 |
| 251 | - 300 | 7 |
| 301 | - 350 | 8 |
| 351 | - 400 | 9 |
| 401 | + | 10 |

f. <u>Initial Training Program</u>. As soon as possible following the execution of this Agreement, or at such other time as Draeger and DASP may agree, Draeger shall make available to DASP's key service personnel (maximum of six (6), such personnel at any one time), training, advice and guidance as Draeger deems necessary to be appropriate to allow for the proper training and instruction for installation and service of the Draeger Interlock device. Normal time required for such training is two to three days, but may take longer depending on the level of competence of the DASP personnel. Draeger shall provide such complementary training to DASP. Such training shall include installation, servicing, and electronic data collection of any Draeger device being used from time to time by DASP. Expenses for travel, room, and board associated with the above training will be borne by DASP.

g. <u>Continuing Training Program</u>. Draeger shall make available additional training courses for new employees assigned to this application, after the initial training for the persons described in subparagraph 'f', above, at the rate of $150.00 per day for each person (minimum of 2 persons required). Expenses for travel, room, and board associated with the above training will be borne by DASP. To the extent possible, Draeger will provide additional training materials and updates on manuals and software by way of disk, mail, or e-mail or by other suitable means, to allow DASP key service personnel to train DASP technicians in present or future devices, their service features, maintenance and their repair for non-warranty purposes. Draeger reserves the right to change the rate for charges for additional training if DASP requires additional course content in an amount reasonably calculated to fairly compensate Draeger for the additional course content.

h. <u>New and Updated Technology</u>. Draeger shall make available to DASP all new Draeger

Initials _____   5/29/2008

Draeger Safety Diagnostics, Inc.

Interlock devices, information and technology as it becomes available. Both parties agree that the interlock technology will be changing rapidly and that staying abreast of those changes and offering up-to-date technology and software is important to maintaining a leadership position in the interlock industry.

i.   Product liability. Draeger will provide product liability insurance in the amount of at least that required by any state or interlock program and will provide to DASP proof that DASP and the respective state program is an additional insured under that policy as such programs are established.

j.   Warranty of Devices.  Draeger will provide warranty service for the devices except for misuse as defined in paragraph 21 of this Agreement. Warranty service shall include any service to parts or material of the device or the firmware that controls the device resulting from defective materials or workmanship by Draeger, or that can not be serviced in the field, including repairs to the sensor or sampling system, system circuit boards cases (except by misuse), or any components of the device. DASP shall return to Draeger all devices in need of warranty service.  The cost of shipping to Draeger's designated address shall be borne by Draeger. Draeger may, in its discretion, provide a new or refurbished interlock device that is compatible with the program in which the device is being serviced by DASP in place of the device that has been returned for warranty service. DASP shall provide to Draeger a written statement/ observation with each device returned (with an authorized RMA#) indicating the reason for the return, to assist Draeger in making the repairs to devices returned.

k.   Non-Warranty Repairs and Costs. DASP shall be required to pay Draeger for repair or inspection work required to be performed on devices due to the misuse, abuse, or neglect of devices by DASP.  For Non-warranty repairs Draeger shall invoice DASP and DASP shall pay Draeger $73.00 per hour for labor, plus costs for parts.

l.   Warranty Service.  If DASP is requested to retrieve a Device, or to provide remote (out of shop) warranty service for Draeger equipment, DASP must obtain prior approval from a designated Draeger employee. DASP shall provide an explanation of the reason for the need of service, estimate of time needed to provide service, and location of the service. Approved service shall be documented by DASP on the appropriate Draeger form and submitted by DASP to the designated Draeger employee.

m.  Device Certification.   Draeger shall provide, upon DASP's request, documentation confirming that Draeger Interlock devices meet the certification requirements of the jurisdiction in which DASP is authorized under this Agreement to perform services with respect to such devices.

n.   Service Support Materials and Software. Draeger agrees that it shall provide DASP with all information about Draeger Interlock devices that Draeger deems necessary for performing the services DASP is obligated under the terms of this Agreement to provide. Any drawings, data, designs, software programs or other technical information supplied by Draeger in connection with this Agreement shall remain Draeger's property and shall at all times be held in confidence by DASP. Such materials and information shall be used only for purposes of allowing DASP to perform the services required under this Agreement, shall not be used for

Draeger Safety Diagnostics, Inc.

any other purposes, and shall not be reproduced or disclosed to others without Draeger's prior written consent. Upon termination of this Agreement, DASP shall not be authorized to use such materials and information and shall return to Draeger any and all originals and copies of such materials and information.

6. <u>Litigation Disclosure</u>.  DASP and Draeger shall disclose to each other any litigation or investigations concerning ignition interlock service, whether prior or pending, or occurring in the future. Notice of such litigation or investigation shall be given by one party to the other within twenty (20) days of notification. Failure to so notify the other party of litigation or an investigation may be grounds for cancellation of this Agreement by either party.

7. <u>Change of Status</u>.  Because both parties agree that it is important to allow the other party to know who to contact in the other organization at all times about any problems or issues that might arise from time to time in the event that there is any change in DASP directors, officers, management, DASP shall report such change, including all pertinent addresses, to Draeger within five (5) days of such change via phone/fax to be followed by written confirmation. Draeger shall have the right to conduct background checks on any person under this section, such checks may include, but not be limited to, criminal history, credit, financial, and/or driving history, as deemed appropriate by Draeger. Likewise, changes in Draeger Safety Diagnostics, Inc. directors, officers, or its corporate management or the account representative for the division shall be reported to DASP within five (5) days of such change via phone/fax to be followed by written confirmation. Failure to disclose such changes within the time period set forth above will be grounds for termination of this Agreement, if such failure causes any material loss to the parties entitled to the notice.

8. <u>Non-competition, Non-Disclosure</u>. DASP shall not, during the term of this Agreement, either directly or indirectly, on its own behalf or in the service or on behalf of others, engage in, contract for, or be involved in any business which is the same or essentially the same, or in any way competes with the Draeger Interlock device. DASP shall not use any manufacturer's device other than Draeger's during the term of this Agreement unless the same is canceled by either party as permitted in this Agreement. It is recognized by each party that during the course of the execution of this Agreement and the respective roles described in this Agreement, each party will come into possession of, or have knowledge of, software designs, hardware designs and other proprietary information of the other. Each party warrants and agrees that it will not disclose any such proprietary information of the other that it might come to have in its possession at any time from this date forward, and continuing to a period of 5 years after the termination of this Agreement. Upon termination of this Agreement, no party shall use the proprietary information of the other party unless expressly authorized to so under the terms of this Agreement.

9. <u>Status of the Parties</u>. The relationship created by this Agreement shall be that of DASP being authorized by Draeger to perform the services described herein for Draeger devices and the Clients leasing those devices.  Neither party will bind the other to any agreements or representations without its expressed written approval. Nothing in this Agreement shall be construed so as to create any relationship other than that of a service provider of Draeger products.

DASP shall perform its duties hereunder as an independent contractor, and not as an employee,

Draeger Safety Diagnostics, Inc.

agent, or franchisee of Draeger. Neither DASP nor any agent or employee of DASP shall be or be deemed to be an agent, franchisee, or employee of Draeger; likewise, no agent or employee of Draeger shall be considered an agent, franchisee, or employee of DASP.

Nothing contained in this Agreement shall be construed as indicating that Draeger is taking responsibility (nor is Draeger responsible) for monitoring or supervising the installation or maintenance services rendered by DASP pursuant to this Agreement.

DASP acknowledges that DASP and its employees are not entitled to unemployment insurance benefits unless DASP or a third party provides such coverage and that Draeger does not pay for or otherwise provide such coverage. DASP shall have no authorization, express or implied, to bind Draeger to any Agreements, liability, or understanding, and shall not be authorized to make any representations on behalf of Draeger or to claim any affiliation whatsoever with Draeger except as expressly set forth herein.   DASP shall provide and keep in force workers compensation and unemployment compensation insurance (and provide proof of insurance on a semi-annual basis) in the amounts required by law, and shall be solely responsible for the acts of DASP, its employees and agents.

10. Insurance.  DASP shall, at its own cost and expense, purchase and maintain, continuously throughout the term hereof, the following insurance coverage, against damage or loss caused by DASP or its employees or agents:

   a.  Commercial General Liability in no less than $1,000,000 per occurrence and $2,000,000 aggregate limit for Bodily injury and Property Damage or Garage Insurance in no less than $1,000,000 per occurrence and $2,000,000 aggregate limit for Bodily injury and Property Damage.

   b.  Automobile Liability for Owned and Non-Owned automobiles as required by the respective states.

   c.  Workers' Compensation Insurance and Unemployment Compensation Insurance, as required by the respective states, with respect to all DASP employees, officers, and owners.

   d.  Proof of all Commercial General Liability or Garage Liability insurance required above to be provided and maintained by DASP hereunder shall be provided to Draeger within ten (10) days of the execution of this Agreement, certificates evidencing all insurance required under this section. All policies shall be endorsed to provide that they may not be terminated or canceled except upon thirty (30) days prior written notice by the insurer to Draeger. DASP must provide proof of such coverage to Draeger in the form of a certificate evidencing insurance coverage and showing Draeger as an additional insured.

11. Assignment. DASP shall not sell, assign, transfer, sub-license or encumber this Agreement or any right or interest of DASP herein, or suffer or permit any such sale, assignment, transfer, sub-license or encumbrance to occur by operation of law or otherwise, without the prior written consent of Draeger. Any violation by DASP of this section shall constitute a material breach of this Agreement and Draeger shall have the right to immediately terminate the Agreement upon written notice to DASP.

Draeger Safety Diagnostics, Inc.

12. <u>Ownership of Interlock Devices and Client Leases</u>. Every device provided by Draeger is owned by, and shall remain the sole and exclusive property of Draeger. Every Client "Equipment Lease Agreement" signed on behalf of Draeger is owned and shall remain the sole and exclusive property of Draeger. DASP shall not, directly or indirectly, encumber or otherwise impair Draeger's title to the device or Client Equipment Lease. Draeger warrants that it is not prohibited from delivering devices to DASP. Draeger further warrants that Draeger Safety Diagnostics, Inc., is a corporation in good standing.

13. <u>Warranty</u>. Draeger's warranties for any devices installed, serviced, maintained or repaired under this Agreement are specifically limited according to the terms of paragraph 5. j. of this Agreement. Further:

Draeger shall not be liable for damage due to automobile collision, fire, misuse, abuse, or device tampering or for any other costs due to failures caused by failure to abide by the manufacturers' instructions on installation and use of the device, or by the improper installation or improper use of the devices. Draeger shall not be liable for any indirect, incidental, consequential or special damages from or occasioned by the devices, except as provided for by law in jurisdictions where such disclaimers are not valid.

DRAEGER MAKES NO EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THE INTERLOCK DEVICES OR THE TRAINING, PARTS OR SERVICES PROVIDED BY DRAEGER IN CONNECTION WITH THOSE DEVICES OTHER THAN THE WARRANTIES DESCRIBED HEREIN. DRAEGER EXPRESSLY DISCLAIMS ANY AND ALL OTHER WARRANTIES AND IN NO EVENT SHALL DRAEGER BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES. IN ADDITION, IN NO EVENT SHALL DRAEGER'S LIABILITY WITH RESPECT TO ANY CLAIM, WHETHER IN CONTRACT, TORT, OR OTHERWISE, FOR ANY LOSSES OR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE MANUFACTURE, DELIVERY, SALE, RESALE, OR OTHER USE OF ANY DRAEGER INTERLOCK DEVICE, TRAINING, PART OR SERVICE EXCEED THE PRICE PAID BY DASP FOR THE DEVICE, TRAINING, PART OR SERVICE GIVING RISE TO THE CLAIM.

14. <u>Indemnification</u>. DASP agrees to indemnify and to hold harmless Draeger, its officers, agents and employees, and their successors and assigns, in respect to all causes of action, claims, demands, liabilities, loss, damage, actions, litigation, or other expenses, including Attorney fees and costs, which may arise as a result of any action or omission by DASP or its officers, agents, or employees.

15. <u>Arbitration</u>. Any dispute arising under, out of, in connection with, or in relation to this Agreement, or any breach hereof, shall be determined and settled by arbitration held in Dallas, Texas, pursuant to the Commercial Arbitration Rules (including the Optional Rules for Emergency Measures of Protection) of the American Arbitration Association (AAA). The

Draeger Safety Diagnostics, Inc.

arbitration shall consist of one arbitrator. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

16. <u>Notice</u>. Any notice required or permitted by this Agreement shall be delivered in person or sent by facsimile transmission, with a confirmation copy sent by first class mail in the U.S. Mail, with sufficient postage attached. Such notice shall be effective upon personal delivery or upon facsimile transmission. All notices shall be addressed to the appropriate party as follows:

If to Draeger:

George Ballance, President and CEO
Draeger Safety Diagnostics, Inc.
4040 W. Royal Lane, Suite 136
Irving, TX 75063

If to DASP:

Paul Dewey, Owner
New Horizon Interlock, Inc.
29234 Lyon Oaks Drive
Wixom, MI 48393

or to such other person and address which either party might designate from time to time, in writing.

17. <u>Confidentiality</u>. DASP and Draeger acknowledge that each may come into contact with confidential information. The confidentiality of any information shall be respected, and no confidential information will be passed to any third party or used by DASP or Draeger in any way except as authorized by the State and by this Agreement, nor be retained in any files of DASP or Draeger. In addition, each party acknowledges that the other will come into possession of the technical or software protocols and product of the other party, and each agrees to keep such information confidential and not to use or to disseminate the information to any party without the written consent of the other party being first obtained. DASP will not disclose any item regarding the parties' business arrangement without the express written permission of Draeger, unless otherwise required by a court of competent jurisdiction or by law.

18. <u>Discrimination and Affirmative Action</u>. Draeger is committed to a nondiscriminatory policy with regard to employees and applicants. These decisions are made without regard to race, color, religion, national origin, age, sex, veteran status, or physical or mental disability of an otherwise qualified person. All Draeger subcontractors or DASP's are required to comply with this same standard of commitment.

19. <u>Governing Law: Jurisdiction</u>.     This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Texas, without giving effect to principles of conflicts of law. Any disputes arising under this agreement are subject to binding arbitration through the American Arbitration Association or other mutually agreed nationally recognized arbitration

Draeger Safety Diagnostics, Inc.

service located in the State of Texas. For the purpose of this provision, the arbitrator shall determine which, if any, party is deemed to be the prevailing party.

20. Miscellaneous.

   a. Entire Agreement. This instrument contains the entire Agreement of the parties and no representations, inducements, promises, or Agreements, oral or otherwise, not embodied herein shall be of any force and effect.

   b. Amendments. This Agreement may not be amended or modified except by a writing signed by the parties hereto.

   c. Invalidity. Should any part of this Agreement for any reason be declared invalid, such decision shall not affect, the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

   d. Binding Effect. Except as this Agreement expressly provides to the contrary, this Agreement will inure to the benefit of and be binding upon the heirs and successors of the parties.

   e. No Waiver. Any breach, default, or failure to perform any term or condition of this Agreement shall not be deemed waived or released by a party's silence, and any such waiver or release shall not be effective unless made in writing by an authorized representative of the party making the waiver. The waiver of any term or provision of this Agreement shall not constitute waiver of a future breach, default or failure to perform for the waived provision, unless expressly provided in the written waiver. The waiver of any term or provision of this Agreement shall not constitute waiver of any other term or provision of this Agreement not specifically addressed in the written waiver.

   f. Section Headings. The section headings or titles are for convenience only and shall have no substantive effect in the interpretation of this Agreement.

   g. Use of Name: Draeger grants the DASP a personal consent to use the marks DRAEGER and DRAEGER INTERLOCK in a factual way in advertising materials to the extent necessary to indicate that DASP is an authorized DASP for the Draeger Interlock product(s) at addresses listed in Exhibit B of this Agreement. All such materials must clearly display the following trademark notice: "DRAEGER and DRAEGER INTERLOCK" are trademarks owned by Draeger Safety, Inc. and are used by permission." DASP shall not use DRAEGER or DRAEGER INTERLOCK" in a trademark fashion without the prior, written permission of Draeger. DASP shall not use any other mark(s) in connection with promoting the Draeger products or the services described in this Agreement without the prior, written permission of Draeger; for the sake of clarity, DASP's use of its own trade name shall not be considered to violate this restriction.

   h. Force Majeure. Neither DASP nor Draeger shall be liable to the other for any delay in, or failure of performance of, any covenant or promise contained in this contract, nor shall any delay or failure constitute default or give rise to any liability for damages if, and only to the

Draeger Safety Diagnostics, Inc.

extent that, such delay or failure is caused by force majeure. As used in this Agreement, 'force majeure' means fire, explosion, action of the elements not already considered by the applicable state certification process as it applies to ignition interlock devices (it being the intent to require the devices to operate as required under the applicable state certification and device operating protocols notwithstanding the elements to which the device might be subjected), strike, interruption of transportation, rationing, court action, illegality, or any other cause which is beyond the control of the party affected and which, by the exercise of reasonable diligence, could not have been prevented by the party affected.

i.  <u>Authority to Execute</u>. Each party hereby warrants and assures and guarantees to the other party that it possesses the legal authority to enter into this Agreement. The persons signing this Agreement for each party warrant and represents that they have full right, power and authority to execute this Agreement on behalf of his respective party.

21. <u>Definitions</u>. In this Agreement, these terms will have the, following definitions:

a.  "As needed" shall mean equipment of a proprietary or exclusive use nature needed by DASP technicians to service, install, or otherwise facilitate the administration of each service facility, or by other DASP management personnel, as agreed upon by both parties.

b.  Certification or "certified," or "certified device" means that the manufacturer or the DASP of the device has actually received written permission, according to law or rules and regulations, to distribute, install, service, and otherwise make available a device to the public, and that this written permission has been received from that agency in any respective State that is charged with the responsibility for granting or denying such permission or certification.

c.  "Customer" is defined as any state or federal authority in cases wherein Draeger is a provider of interlock services under a contract.

d.  "Client" is defined as any individual person using Draeger interlock devices or interlock services.

e.  "Establish interlock facilities," or "establishes an interlock service location" will mean that the DASP has actually opened a place of business with the equipment and personnel required to staff and maintain the same.

f.  "Misuse" shall mean damage or loss resulting from misuse, abuse, accident, neglect, improper installation, improper maintenance or use, or mechanical, electrical, vehicle fire or environmental circumstances such as corrosion to parts of the device.

g.  "Written notice" may consist of a writing that is mailed, first class mail, postage prepaid, a writing that is sent by facsimile, or a writing that is hand-delivered writing.

Draeger Safety Diagnostics, Inc.

IN WITNESS WHEREOF, the parties have entered into this Agreement this 29th day of May 2008.

DRAEGER SAFETY DIAGNOSTICS, INC.

By: _____
     George Ballance, President and CEO


NEW HORIZON INTERLOCK, INC.

By: _____
     Paul Dewey, Owner

Draeger Safety Diagnostics, Inc.

## ATTACHMENTS TO DRAEGER AUTHORIZED SERVICE PROVIDER AGREEMENT BETWEEN DRAEGER SAFETY DIAGNOSTICS, INC. AND NEW HORIZON INTERLOCK, INC.

### Exhibit A – Preventive Maintenance

- verify wire harness length prior to installation - minimum length 14"
- verify wire harness length after removal - minimum length 14"
- clean and inspect handset and control box prior to installation
- clean and inspect handset and control box after removal
- send all equipment out of specification back to Draeger for repair

### Exhibit B – Service Locations and Hours of Operation

The service address(s) including days and hours of available service in this Agreement are as follows:
Service Locations:  Multiple throughout Michigan and Wisconsin.
Main location located at:
29234 Lyon Oaks Drive
Wixom, MI 48393

Hours of Operation:

Monday:  Varies by location.

Tuesday:  Varies by location.

Wednesday:  Varies by location.

Thursday:  Varies by location.

Friday:  Varies by location.

Saturday:  Varies by location.

Sunday:  Varies by location.

### Exhibit C – Standard Fees and Charges

Installation:

De-Installation:

Change Vehicle:

Calibration/Monitor Check:

Violation Re-Set:

Road Service:

Missed Appointment:

Bad Check:

Multiple vehicles:

Economic Hardship:

Initials

5/29/2008

# EXHIBIT B



May 26, 2010

**Via Facsimile and Federal Express**

Paul Dewey
New Horizon Interlock Inc.
29234 Lyon Oaks Drive
Wixom, MI 48393

Re:  Notice of Non-Renewal of Draeger Authorized Service Provider Agreement

Dear Paul:

We are writing with respect to the Draeger Authorized Service Provider Agreement dated May 29, 2008 (the "Agreement") between Draeger Safety Diagnostics, Inc. ("Draeger") and New Horizon Interlock Inc. ("New Horizon").  Pursuant to Paragraph 2 of the Agreement, this letter provides prior written notice of Draeger's intention not to renew the Agreement when it expires on June 30, 2010.

While New Horizon has provided valuable service to Draeger during the term of the Agreement, a number of circumstances, including repeated payment delinquencies by New Horizon and New Horizon's near constant credit hold status, have lead us to the decision not to renew the Agreement.

Notwithstanding this decision, Draeger is prepared to offer New Horizon the opportunity to extend the expiration date of the Agreement for an additional six months in order to allow both companies a more orderly transition of business activities.  If New Horizon is amenable to such an extension, please return an executed copy of the enclosed amendment to me for countersignature.  Once the amendment is fully executed, the Agreement will automatically and without further notice terminate on December 31, 2010.

If, however, you decline the offer to extend the termination of the Agreement on the terms set forth in the proposed amendment, New Horizon's appointment under the Agreement will expire as scheduled on June 30, 2010.  As a result, effective July 1, 2010, Draeger or its designee(s) will directly assume all responsibilities for administrative and other account support services for all Draeger devices currently installed, leased and/or serviced under the Agreement.

We hope and expect that New Horizon and Draeger will continue to work amicably together throughout the remaining term of the Agreement, whether on an extended basis or not, and address any transitional issues that may arise with respect its expiration.  In the interim, we

Draeger Safety Diagnostics, Inc.
4040 W Royal Lane,
Suite 136
Irving, TX 75063
Tel +1 972 929-1100
Fax +1 972 929-1260



request that you provide us with copies of all documents and agreements relevant to the deployment of Draeger devices, including those indentified in Paragraph 3b of the Agreement. We also request that, pursuant to Paragraph 3c, no currently-installed Draeger devices be removed from any vehicles prior to the expiration of the device's lease without Draeger's express, prior written consent.

Please call us should you have any specific questions or suggestions about accomplishing this transition as we wind down the Agreement. And we will, of course, proceed with the understanding that both New Horizon and Draeger will abide their respective obligations under the Agreement until the expiration of its term, including, but not limited to, the matters set forth above.

Sincerely,

George Ballance
President & CEO
Draeger Safety Diagnostics, Inc.


Cc: Todd Gavin, Draeger Safety Diagnostics, Inc.


Enclosure

Draeger Safety Diagnostics, Inc.
4040 W Royal Lane,
Suite 136
Irving, TX 75063
Tel +1 972 929-1100
Fax +1 972 929-1260

USA0206

# EXHIBIT C

# AMENDMENT

This Amendment (this "Amendment") is made part of and amends that certain Draeger Authorized Service Provider Agreement dated May 29, 2008 (the "Agreement") by and between Draeger Safety Diagnostics, Inc. ("DSDI"), a Delaware corporation with its principal place of business at 4040 W. Royal Lane, Suite 136, Irving, TX 75063, and New Horizon Interlock Inc. ("DASP"), a Michigan corporation with its principal place of business at 29234 Lyon Oaks Drive, Wixom, MI 48393. Unless otherwise defined herein, capitalized terms shall have the definitions set forth in the Agreement.

WHEREAS, the term of the Agreement is set to expire on June 30, 2010 and DSDI has delivered written notice to DASP of its intent not to renew the Agreement; and

WHEREAS, the parties have agreed, in lieu of allowing the Agreement to expire on June 30, 2010, to extend the current term of the Agreement for an additional six months to permit more orderly transition by the parties to other business opportunities.

NOW, THEREFORE, for good and valuable consideration, intending to be legally bound and pursuant to the terms and conditions of the Agreement, it is hereby agreed as follows:

1. Section 2 of the Agreement is hereby amended to extend the term of the Agreement until December 31, 2010. The Agreement shall automatically, and without further notice from either party, expire and terminate on December 31, 2010.

2. During the extended term of the Agreement, the parties will cooperate in good faith toward the orderly transition of responsibilities for installing, leasing and/or servicing Draeger devices in the areas currently covered by the Agreement to Draeger or its designee(s).

3. Section 4.1 of the Agreement is hereby amended to change the equipment lease fees for the XT and IL-920 interlock devices from $27.00 per month to $30.00 per month, effective July 1, 2010.

4. In the event of any conflict, inconsistency or incongruity between the provisions of this Amendment and any other provisions of the Agreement, the provisions of this Amendment shall in all respects govern and control.

5. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

6. Unless otherwise expressly modified herein, the terms and conditions set forth in the Agreement remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed as of _____, 2010.

NEW HORIZON INTERLOCK INC.                    DRAEGER SAFETY DIAGNOSTICS, INC.

By: _____                   By: _____

Printed Name: _____                   Printed Name: _George Ballance_

Title: _____                   Title: _President_

# EXHIBIT D



December 28, 2010

**Via Facsimile #248-446-9201and First Class Mail**

Tel
215-660-2328

Mr. Paul Dewey
New Horizon Interlock Inc.
29234 Lyon Oaks Drive
Wixom, MI 48393

Fax
215-660-2742

E-Mail
dori.mansur@draeger.com

**Re:  Notice of Non-Compliance with Draeger
      Authorized Service Provider Agreement**

Dear Mr. Dewey:

This letter serves formal notice that you are in non-compliance with several provisions of the Draeger Authorized Service Provider Agreement dated May 29, 2008 and amended May 29, 2010 (the "Agreement") between Draeger Safety Diagnostics, Inc. ("Draeger") and New Horizon Interlock Inc. ("New Horizon").  Not only are you in serious payment default under the Agreement, but I understand from my client that you are removing Draeger devices from client vehicles in clear violation of the Agreement, among other contract defaults.

With regard to your payment default, I am told that you have a balance of $105,181.76 past due since September 1, 2010, and that you will owe an additional three months of lease fees before the Agreement is complete.  Your failure to pay all contractually owed lease and other fees constitutes a material breach of the Agreement that must be remedied immediately. Your failure to do so will result in Draeger taking legal action to recover these funds.

On the subject of your other contract defaults, I have been advised that you are facilitating the early removal of Draeger devices from existing client vehicles in anticipation of the Agreement's expiration this month.   Removal of Draeger devices without Draeger's permission is strictly prohibited under Paragraph 3.b of the Agreement.  Your continued failure to adhere to the applicable provisions of the Agreement, whether during or after its expiration, will result in Draeger taking swift legal action, including without limitation, filing for injunctive and other relief.  We may also seek similar relief against any other actions on your part that have the effect of damaging our reputation or interfering with our client relationships, including making false or disparaging statements to Draeger clients or retaining client funds for periods beyond the Agreement term.

Lastly, I want to remind you of your obligations under Paragraph 3.c of the Agreement to return all uninstalled devices and equipment and to turn over all client records, electronic data and reports relating to the Agreement within five days of the expiration of the Agreement.  To make these returns easier, we have arranged for two of our employees to visit your facility on January 6th, so ask that you have these items ready for release to them.

3135 Quarry Road
Telford, PA 18969 USA
Tel +1 215 721 5400
Fax +1 215 660-2742
www.draeger.com



In conclusion, it is our desire that Draeger and New Horizon part ways on good terms, and we hope that this letter will succeed in convincing you to remedy the current defaults without the need for further legal action. If, however, this letter does not persuade you to bring your accounts current and to cease all actions constituting a breach of the Agreement, we are prepared to exercise all available legal rights to accomplish the same purpose and advise that you prepare for such action.

Sincerely,


Dori Mansur Ratka
Senior Corporate Counsel


Cc: George Ballance, Draeger Safety Diagnostics, Inc.

3135 Quarry Road
Telford, PA 18969 USA
Tel +1 215 721 5400
Fax +1 215 660-2742
www.draeger.com

# EXHIBIT E

# Pepper Hamilton LLP
### ——Attorneys at Law——

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

A. Christopher Young
direct dial: 215-981-4190
direct fax: 215-981-4750
youngac@pepperlaw.com

January 12, 2011

*Via Facsimile and First Class Mail*
William Foren, Esquire
Foren & Glaser
53435 Grand River Avenue
New Hudson, MI 48165

Re:   Draeger Safety Diagnostics, Inc. v. New Horizons Inc.

Dear Mr. Foren:

As per the voice mail message I left with your office this afternoon, I represent Draeger Safety Diagnostics, Inc. ("Draeger") with regards to the termination of the Draeger Authorized Service Provider Agreement dated May 29, 2008 (the "Agreement") as amended on May 29, 2010. I am writing to you as counsel for New Horizons Inc. per the instructions of Mr. Paul Dewey. If you have not been retained to represent New Horizons or Mr. Dewey with regards to this dispute, please advise immediately.

I am writing to demand that New Horizons return to Draeger, among other things, the client records, electronic data and other reports as required by the Agreement. On January 6, 2011, Draeger personnel met with Mr. Dewey who returned equipment belonging to Draeger. Upon inspecting the returned material after the meeting, Draeger discovered that Mr. Dewey had not returned the client records, electronic data and other reports as required by the Agreement. These records are the property of Draeger which needs them to comply with its reporting obligations to legal authorities in Michigan. As a former Draeger Authorized Service Provider, New Horizons has absolutely no basis for retaining the records and data.

Please contact me upon receipt of this letter to arrange the immediate return of these records.

Very truly yours,

*A. Christopher Young*

A. Christopher Young

ACY/cd

---

| Philadelphia | Boston | Washington, D.C. | Detroit | New York | Pittsburgh |
| Berwyn | Harrisburg | Orange County | Princeton | Wilmington |

www.pepperlaw.com

4

**AMERICAN ARBITRATION ASSOCIATION (AAA)**
**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION (ICDR)**

**PROCEEDINGS CONDUCTED UNDER THE AAA OPTIONAL RULES FOR**
**EMERGENCY MEASURES OF PROTECTION**

---

DRAEGER SAFETY DIAGNOSTICS, INC.

v.

NEW HORIZON INTERLOCK, INC.

**AAA/ICDR CASE NO. 50 117 T 00017 11**

---

**INTERIM AWARD OF EMERGENCY RELIEF**

I, THE UNDERSIGNED EMERGENCY ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the Parties on May 29th, 2008, and having been duly sworn, and having heard the proofs and allegations of the Parties, do hereby AWARD as follows:

**I.     THE PARTIES**

1.     Claimant is Draeger Safety Diagnostics, Inc. ("Draeger"), a Texas-based company that manufactures breath alcohol ignition interlock devices for use in motor vehicles ("Interlock Devices") and that is represented in these emergency proceedings by Mr. Christopher A. Young and Ms. Jennifer Lambert of Pepper Hamilton LLP.

2.     Respondent is New Horizon Interlock, Inc. ("New Horizon"), a Michigan-based company that on May 29th, 2008 entered into a Draeger Authorized Service Provider Agreement with Draeger (as amended, the "DASP Agreement"). Under the DASP Agreement, New Horizon became authorized to install, inspect, calibrate, and de-install Draeger Interlock Devices upon certain terms and conditions. As elaborated on at paras. 9 to 17 below, New Horizon has not entered an appearance or been represented by counsel or otherwise in these emergency proceedings.

**II.     THE ARBITRATION CLAUSE**

3.     DASP Agreement Section 15 contains an arbitration clause providing as follows:

> "Arbitration. Any dispute arising under, out of, in connection with, or in relation to this Agreement, or any breach hereof, shall be determined and settled by

- 1 -

arbitration held in Dallas, Texas, pursuant to the Commercial Arbitration Rules (including the Optional Rules for Emergency Measures of Protection) of the American Arbitration Association (AAA). The arbitration shall consist of one arbitrator. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof."

(Emphasis in the original.)

4.      DASP Agreement Section 19, for its part, provides as follows:

"Governing Law; Jurisdiction. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Texas, without giving effect to principles of conflicts of law. Any disputes arising under this Agreement are subject to binding arbitration through the American Arbitration Association or other mutually agreed nationally recognized arbitration services located in the State of Texas. For the purpose of this provision, the arbitrator shall determine which, if any, party is deemed to be the prevailing party."

(Emphasis in the original.)

## III.    APPLICABLE RULES

5.      In keeping with DASP Agreement Section 15, these emergency proceedings are governed by the AAA Optional Rules for Emergency Measures of Protection ("Optional Rules").

## IV.    INTRODUCTION TO THE EMERGENCY DISPUTE AND PROCEDURAL STATEMENT

6.      On January 18th, 2011, Draeger instituted these emergency proceedings through the submission of a Request for The Appointment of An Emergency Arbitrator ("Request"), which was received by the AAA/ICDR on January 19th, 2011. As explained in the Request, these proceedings involve DASP Agreement Section 3(c), which provides as follows:

"Within five (5) days of cancellation, termination or expiration of this Agreement, [New Horizon] shall return to Draeger all un-installed rented/leased devices and equipment in its possession, and turn over all records, electronic data, and reports relating to this Agreement. The parties expressly acknowledge and agree that such records, electronic data, and reports relating to the services provided pursuant to this Agreement are the property of Draeger; provided, however, that [New Horizon] may retain copies of such records, electronic data, and reports for the purpose of complying with statutory data or records retention obligations or for prosecuting or defending non-payment, default, or other claims relating to DASP services."

7.  In essence, Draeger asserts that: (i) the DASP Agreement expired on December 31st, 2010; (ii) while Draeger has been able to retrieve certain Interlock Devices previously held by New Horizon, to this date New Horizon has not turned over any client records, data, and other reports, thus breaching DASP Agreement Section 3(c); (iii) Draeger needs to immediately receive not only any Draeger Interlock Devices that New Horizon may still hold, but also the records, data, and reports mentioned in Section 3(c), because these are needed to discharge Draeger's statutory reporting obligations to the State of Michigan; and (iv) failure to timely discharge these reporting obligations may lead to Draeger being decertified as an Interlock Device manufacturer by the State of Michigan.

8.  On January 20th, 2011, the AAA/ICDR wrote to the Parties to confirm that the undersigned had been appointed to serve as emergency arbitrator in this case.

9.  Pursuant to notice, a preliminary hearing was conducted by telephone on January 25th, 2011 ("Preliminary Hearing"). Attending the Preliminary Hearing for Draeger were Ms. Bonnie Chong (from Draeger's legal department), Mr. Young, and Ms. Lambert. Attending as emergency arbitrator was the undersigned. New Horizon did not attend. Representatives of the AAA/ICDR were present on the call.

10. In keeping with the need to "provide a reasonable opportunity to all parties to be heard" (Option Rule O-3), the following emergency schedule was established at the Preliminary Hearing and expressly incorporated in Procedural Order No. 1, dated January 25th, 2011:

    (a) January 27th, 2011 at noon (Dallas Time): Expiration of the deadline for Draeger to submit its Memorial in Support of Emergency Relief Application and accompanying exhibits ("Memorial");

    (b) January 31st, 2011 at noon (Dallas Time): Expiration of the deadline for New Horizon to submit its Counter-Memorial and accompanying exhibits rebutting as appropriate Draeger's Memorial and Draeger's Request ("Counter-Memorial"); and

    (c) February 1st, 2011 at noon (Dallas Time): Expiration of the deadline for each Party to indicate the amount of fees and expenses incurred in connection with these emergency proceedings.

11. Procedural Order No. 1 further stated that: "Upon completion of this schedule, and assuming no further submissions are warranted, the emergency arbitrator shall promptly issue an interim award ruling on Draeger's interim relief application." Procedural Order No. 1, ¶ 3.

12. Draeger timely made the Memorial and costs submissions established in the emergency schedule. New Horizon, for its part, filed neither the Counter-Memorial nor a submission on costs.

13. This Interim Award contains the emergency arbitrator's reasoned disposition of the matter pending before him and is issued upon completion of the emergency schedule.

The emergency arbitrator considers that it was not necessary to request submissions from the Parties in addition to those established in the emergency schedule.

## V.   NOTIFICATION REQUIREMENTS

14.   Section O-1 of the Optional Rules establishes in relevant part that notice of an application for emergency relief "may be given by facsimile transmission, or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties." Draeger has addressed this notification requirement on various occasions, including page 3 of the Request, the Preliminary Hearing, pages 4 and 5 of the Memorial, and Exhibits G to M to the Memorial.

15.   Based on the statements made and the evidence provided by Draeger, the chronology of relevant facts for these purposes can be established as follows:

(a)   On January 5th, 2011, New Horizon's owner, Mr. Paul Dewey, wrote to Draeger indicating that all future communications should be forwarded to New Horizon's "legal co[u]ns[e]l:  William Foren, 53435 Grand River, New Hudson, Michigan 48165" (Exhibit G);

(b)   On January 18th, 2011, Draeger successfully delivered the Request to New Horizon's fax number (248 446 9201)[1] and Mr. Foren's fax number (248 486 5119)[2] (Exhibit I);

(c)   On January 24th, 2011, Draeger successfully delivered to New Horizon's fax number and Mr. Foren's fax number the Notice of Appointment of Emergency Arbitrator (which also advised the Parties that the Preliminary Hearing was tentatively scheduled for January 25th, 2011) (Exhibit J);

(d)   On January 24th, 2011, Mr. Dewey left a telephone message with Draeger's counsel acknowledging receipt of certain unidentified legal "papers" and requesting that all future correspondence on the case be addressed to Mr. Michael Diamond, an attorney whom Mr. Dewey encouraged Draeger's counsel to call (Exhibit L);

(e)   Following this telephone message, and still on January 24th, 2011, counsel for Draeger Mr. Young engaged in a telephone conversation with Mr. Diamond, in the course of which Mr. Diamond indicated that "he was not representing New Horizon in [this] arbitration, but would attempt to pass

---

[1]   As of February 1st, 2011, various online directories corroborate that 248 446 9201 is New Horizon's fax number.   See,   e.g.,   http://www.superpages.com/bp/Wixom-MI/New-Horizon-Interlock-Inc-L2052953828.htm (under the Additional Contacts tab).

[2]   As of February 1st, 2011, various online directories corroborate that 248 486 5119 is Mr. Foren's professional fax number at the law firm of Foren & Glaser. See, e.g., http://www.superpages.com/bp/New-Hudson-MI/Foren-Glaser-L2052952999.htm (under the Additional Contacts tab).

on the information [regarding this arbitration] to Mr. Dewey and Mr. Foren" (Memorial, page 5);

(f)  Additionally, during the conversation with Mr. Young, Mr. Diamond also provided his email address, to which Draeger sent that same day (i.e., January 24, 2011) relevant communications regarding these emergency proceedings, including confirmation that the Preliminary Hearing would take place on January 25th, 2011 (Exhibits K and M);

(g)  On January 28th, 2011, the AAA/ICDR wrote to Draeger's counsel saying: "The ICDR confirms receipt of Claimant's [Memorial] dated January 27, 2011 and exhibits. We understand that a copy was sent to Emergency Arbitrator Sabater and Respondent's Counsel via fax. Otherwise, please advise"—Draeger did not advise the AAA to the contrary;

(h)  On February 1st, 2011, Draeger filed its submission on costs indicating that a copy of it was being faxed to Mr. Foren's number.

16.  In sum, Draeger gave notice by fax to New Horizon of the Request, the Notice of Appointment of Emergency Arbitrator, the Memorial, the Preliminary Hearing, and other relevant submissions and correspondence regarding these emergency proceedings. Moreover, Draeger has made statements and provided document-supported explanations confirming that good faith steps were undertaken to deliver the Request and other relevant submissions and notices to New Horizon. Nothing in the record suggests that New Horizon did not receive these notifications. Consequently, the service requirements set out in Section O-1 of the Optional Rules have been satisfied.

## VI.  ADDITIONAL NOTIFICATION MEASURES

17.  Without prejudice to Draeger's compliance with Section O-1's notification requirements, the AAA/ICDR has taken independent steps to ensure that New Horizon received relevant correspondence regarding the case. Specifically, the AAA/ICDR successfully faxed to Mr. Foren's law offices the Notice of Appointment of Emergency Arbitrator (which also advised the Parties that the Preliminary Hearing was tentatively scheduled for January 25th, 2011) and the Notice of Preliminary Hearing. Also, the AAA/ICDR successfully sent Procedural Order No. 1 (containing the procedural schedule for these emergency proceedings) to Mr. Foren's law offices by fax and Federal Express.

## VII.  MERITS OF DRAEGER'S EMERGENCY APPLICATION

18.  The Optional Rules' notification requirements having been met, and New Horizon having had a reasonable opportunity to be heard, it is necessary to determine whether Draeger is entitled to the emergency measures of protection it seeks in these proceedings. The requirements needed for the issuance of these measures are set out in Sections O-4 and O-6 of the Optional Rules, which provide as follows:

"O-4. Interim Award

If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim award granting the relief and stating the reasons therefore."

"O-6. Security

Any interim award of emergency relief may be conditioned on provision by the party seeking such relief of appropriate security."

19.     Thus, in order for Draeger to obtain emergency protection, four requirements must be fulfilled. First, Draeger must be entitled to the measure it seeks. Section O-4 of the Optional Rules. Second, Draeger must show that immediate loss or damage will result in the absence of emergency relief. Id. Third, Draeger must show that irreparable loss or damage will result in the absence of emergency relief. Id. Fourth, and assuming that all other requirements have been satisfied, Draeger may be required to provide appropriate security. Section O-6 of the Optional Rules. The following sub-sections address each of these requirements separately.

## A.     *Draeger's Entitlement To The Measure It Seeks*

20.     In these emergency proceedings, Draeger seeks an order affording New Horizon ten days to return to Draeger "all: (a) customer records, data, and other reports, as described in Section 3.c of the [DASP Agreement]; and (b) Draeger Interlock XT devices in New Horizon's possession." Paragraph 1, Exhibit N to Draeger's Memorial.

21.     Draeger is effectively entitled to this relief because of the following:

(a)     The DASP Agreement expired on December 31st, 2010 (Section 1 of the May 29, 2010 Amendment to the DASP Agreement);

(b)     Pursuant to DASP Agreement Section 3(c), within five days of the expiration of the DASP Agreement, New Horizon should have returned to Draeger all "un-installed rented/leased devices and equipments in its possession, and ... all records, electronic data, and reports relating to this Agreement ...";

(c)     There is no evidence in the record of these emergency proceedings that New Horizon has fulfilled its obligations under DASP Agreement Section 3(c)—in particular, there is no evidence that New Horizon has returned to Draeger any customer records, data, or other reports as described in DASP Agreement Section 3(c); also, while Draeger acknowledges having received some Interlock Devices, it is unclear whether New Horizon still has some Draeger Interlock Devices in its possession (Request, page 2); and

(d)     There is no evidence in the record of these emergency proceedings establishing or suggesting that New Horizon has a lien on, a right of retention of, or an entitlement or authorization of any nature to withhold, the records, data, reports, and Interlock Devices sought by Draeger.

22.    Consequently, the first requirement needed to grant the emergency relief sought by Draeger is satisfied.

**B.**    *Immediate Loss or Damage*

    **(a)**    **Immediate Loss or Damage with Respect to Records, Data, and Other Reports**

23.    Several facts and legal provisions need to be taken into consideration in order to determine whether Draeger will suffer immediate loss or damage in the absence of emergency relief ordering the return of records, data, and other reports referred to in DASP Agreement Section 3(c).

24.    First, the State of Michigan can require drivers who have been convicted of driving a motor vehicle under the influence of alcohol to install Interlock Devices on their motor vehicles. Request, page 1. Pursuant to Michigan Administrative Code ("Mich. Admin. Code") R 257.1004(6), the manufacturers of these Devices must first be certified and placed on a list of approved companies issued by the State of Michigan (the "List").

25.    Second, Draeger is a State of Michigan-certified Interlock Device manufacturer and is included in the List. Memorial, pages 1 and 2.

26.    Third, as a result of its inclusion in the List, Draeger is statutorily required to report major and minor violations committed by drivers carrying a Draeger Interlock Device. Mich. Admin. Code R 257.313(a)(4). Pursuant to Mich. Admin. Code R 257.313(a)(1), "major violations" include tampering with or circumventing an Interlock Device, as well as an attempt to tamper with or circumvent an Interlock Device. Pursuant to Mich. Admin. Code R 257.313(a)(1), "minor violations" include failing three start-up tests within a monitoring period, as well as failing to report to the Interlock Device installer for monitoring within seven days of a scheduled monitoring date.

27.    Fourth, pursuant to Mich. Admin. Code R 257.313(a)(4), Draeger must report any major violations to the State of Michigan no later than ten days after the violation occurs. The plain language in Mich. Admin. Code R 257.313(a)(4) does not contemplate extensions or grounds upon which the failure to report a major violation within ten days may be excused. In essence, the provision puts on the certified Interlock Device manufacturer the unqualified burden of obtaining information regarding whether third parties—i.e., the drivers of automobiles carrying an Interlock Device—have violated the Code and of promptly reporting all major violations.

28.    Fifth, pursuant to Mich. Admin. Code R 257.1005(1), the State of Michigan may remove from the List—and thus "decertify"—Interlock Device manufacturers who "fail to submit reports" of violations in the time and manner required by Michigan laws.

29.   Sixth, while the DASP Agreement was in force, New Horizon was the only Draeger-authorized installer of Interlock Devices for the State of Michigan. In this capacity, New Horizon obtained customer records, data, reports, and other information that Draeger needed to ascertain whether any violations had been committed and, if so, discharge its statutory reporting obligations vis-à-vis the State of Michigan. Memorial, page 2. With the DASP Agreement still in force, there was a mechanism that allowed Draeger to receive reportable information from New Horizon on an ongoing basis.   DASP Agreement Section 4(c).  Upon expiration of the DASP Agreement, New Horizon unequivocally had five days to turn over to Draeger all reportable information. DASP Agreement Section 3(c).  If complied with, this arrangement still gave Draeger up to five days after the expiration of the DASP Agreement to review that information and report recent major violations as appropriate.

30.   As confirmed by these six circumstances, Draeger will suffer harm if the records, data, and reports it has requested pursuant to DASP Agreement Section 3(c) are not promptly turned over to it.  Based on the language of the Mich. Admin. Code, any Interlock Device manufacturer who misses the ten-day deadline to report major violations will be in breach of its statutory reporting obligations and face the risk of decertification and removal from the List. This risk is acute in the present case, as Draeger already appears to be late for reporting any major violations committed before the expiration of the DASP Agreement on December 31st, 2010.

31.   Given these circumstances, the emergency interim relief Draeger has requested is necessary to help Draeger avoid further harm.  In particular, the requested relief would help Draeger obtain records, data, and reports needed to discharge its statutory obligations without more delays. Filing an untimely report would surely be less harmful for Draeger than filing no report at all. Memorial, page 3.

32.   Consequently, the second requirement needed to grant the emergency relief sought by Draeger is satisfied insofar as customer records, data, and other reports alluded to in DASP Agreement Section 3(c) are concerned.

   **(b)   Immediate Loss or Damage with Respect to Interlock Devices**

33.   In addition to records, data, and other reports, Draeger is seeking the return of any additional Draeger Interlock Devices New Horizon may still have in its possession. The prompt return of these Interlock Devices is needed to preserve Draeger from the loss of the opportunity to use and commercialize these Interlock Devices in other locations for a fee.  Additionally, and without limitation, Draeger would be harmed if New Horizon failed to fully and appropriately preserve any Draeger Interlock Devices it still has in its possession.

34.   Consequently, the second requirement needed to grant the emergency relief sought by Draeger is satisfied insofar as Interlock Devices still in the possession of New Horizon are concerned.

### C.  *Irreparable Harm*

35.  The harm Draeger would suffer in the absence of emergency interim relief is irreparable because it could not be effectively undone with an economic compensation granted in a final arbitral award or court judgment following a trial. If New Horizon does not promptly turn over the customer records, data, and other reports alluded to in DASP Agreement Section 3(c), Draeger may be decertified by the State of Michigan and removed from the List. Mich. Admin. Code R 257.1005(1). This would prevent Draeger from further commercializing Interlock Devices in that State until and unless Draeger is recertified, something which may or may not happen. A final damages award would not make up for that situation.

36.  Similarly, New Horizon's failure to participate in these emergency proceedings or to meaningfully communicate with Draeger in recent times dispels no doubts as to whether New Horizon remains substantially active, still has Draeger Interlock Devices in its possession, and, if so, whether these Devices are being fully and appropriately preserved. If New Horizon failed to fully and appropriately preserve any Draeger Interlock Devices still in its possession, the integrity of those Devices might not be restored by means of a final arbitral award—this award would only grant damages that New Horizon might or might not have the economic ability to pay.

37.  Consequently, the third requirement needed to grant the emergency relief sought by Draeger is satisfied. Because the first three requirements have been met, Draeger is entitled to the emergency relief it seeks in these proceedings. It remains to be determined, however, whether the emergency relief sought by Draeger must be conditioned upon provision of security.

### D.  *Security*

38.  The emergency arbitrator can order the provision of security to ensure that the party against which emergency relief is sought can be compensated for harm suffered as a result of that relief. In this particular case, however, there is no evidence that New Horizon would suffer harm as a result of the adoption of the emergency measures of relief requested by Draeger. The records, data, other reports, and Interlock Devices that must be returned pursuant to this Interim Award belong and are due to Draeger as a matter of contract. DASP Agreement Section 3(c). Nothing in the record of these emergency proceedings establishes or suggests that the mere act of returning property to its owner and complying with a bargained-for and mutually-accepted contractual provision should inflict undue harm to New Horizon or entitle it to compensation. Moreover, insofar as records, data, and reports are concerned, DASP Section 3(c) is clear that New Horizon is entitled to keep a copy of the materials turned over to Draeger. In other words, the information contained in those materials is not something that New Horizon would irretrievably lose upon compliance with this Interim Award. Consequently, Draeger is not required to provide security in order to obtain the emergency relief it is seeking.

- 9 -

## VIII.  COSTS

39.  Pursuant to Section O-8 of the Optional Rules, "The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the panel to determine finally the apportionment of such costs."

40.  On February 1st, 2011, Draeger made a submission on costs indicating that the fees and expenses it has incurred in connection with these emergency proceedings amounts to US$25,161.88. This submission is not final because the emergency arbitrator has not yet submitted its bill for services and because Draeger's submission itself admits on page 1 that certain fees and expenses incurred by Draeger remain to be determined. This does not mean, however, that Draeger is not entitled to be reimbursed for reasonable costs incurred in connection with these emergency proceedings. Draeger—the prevailing party in these emergency proceedings—would not have incurred reasonable costs had New Horizon voluntarily complied with its obligations pursuant to DASP Agreement Section 3(c) or otherwise taken steps towards avoiding these emergency proceedings and their present outcome.

41.  Consequently, New Horizon is ordered to pay any reasonable costs—including fees and expenses—incurred by Draeger in connection with these emergency proceedings. This ruling is made subject to the power of the sole arbitrator—as opposed to the emergency arbitrator—to determine finally the apportionment of these costs.

## IX.  DECISION OF THE EMERGENCY ARBITRATOR

42.  Based on the foregoing, the emergency arbitrator orders that:

(a)  Within ten (10) days of the date of this Interim Award, New Horizon return to Draeger all:

(i)  Customer records, data, and other reports as described in Section 3(c) of the DASP Agreement; and

(ii)  Any and all Draeger Interlock Devices in New Horizon's possession; and

(b)  New Horizon pay any reasonable costs—including fees and expenses—incurred by Draeger in connection with these emergency proceedings, subject to the power of the sole arbitrator to determine finally the apportionment of these costs.

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Award was made in Dallas, Texas.

February 1st, 2011

_____
Date

_____
Aníbal Sabater
Emergency Arbitrator

State of Texas

County of Harris

} SS:

I, Aníbal Sabater, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

February 1st, 2011

_____
Date

_____
Aníbal Sabater
Emergency Arbitrator

State of Texas

County of Harris

} SS:

On this 1st day of February, 2011, before me personally came and appeared Aníbal Sabater, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ALICE V. MAZA
Notary Public, State of Texas
My Commission Expires 10-01-2012

- 11 -

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DRAEGER SAFETY DIAGNOSTICS, INC.

Plaintiff,

v.

NEW HORIZON INTERLOCK, INC.

Defendant.

Case:2:11-mc-50160
Judge: Roberts, Victoria A
MJ: Majzoub, Mona K
Filed: 02-08-2011 At 09:53 AM
PET TO CONFIRM:DRAEGER SAFETY DIAGN
OSTICS V NEW HORIZON INTERLOCK (LG)

*Expedited Consideration Requested*

## BRIEF IN SUPPORT OF DRAEGER SAFETY DIAGNOSTIC INC.'S PETITION TO CONFIRM AND ENFORCE THE INTERIM ARBITRATION AWARD FOR EMERGENCY RELIEF

Plaintiff Draeger Safety Diagnostics, Inc. ("Draeger") petitions this Court to confirm and enforce an arbitration award dated February 1, 2011 in its favor and against Defendant New Horizon Interlock, Inc. ("New Horizon").

## I.   BACKGROUND

### A.   Factual Background

Draeger manufactures, among other products, the Dräger Interlock XT, a breath alcohol ignition interlock device ("BAIID") that, when placed in a motor vehicle, can prevent the vehicle from being started if the driver's breath alcohol concentration is higher than the state's limit. Draeger is certified by the State of Michigan as a manufacturer of BAIID's. In order to carry out its obligations as a certified manufacturer, Draeger contracts with service providers to install the devices and collect the data regarding the devices.

On May 29, 2008, Draeger entered into a Draeger Authorized Service Provider Agreement ("Agreement") with New Horizon in order for New Horizon to became a Draeger Authorized Service Provider ("DASP") within Michigan. Section 15 of the Agreement stated:

> Any dispute arising under, out of, in connection with, or in relation to this Agreement, or any breach hereof, shall be determined and settled by arbitration held in Dallas, Texas, pursuant to the Commercial Arbitration Rules (including the Optional Rules for Emergency Measures of Protection) of the American Arbitration Association (AAA). The arbitration shall consist of one arbitrator. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

<u>See</u> Exhibit 1 to Draeger's Petition at § 15.

Upon termination of New Horizon as a Draeger authorized service provider on December 31, 2010, New Horizon failed to abide by its contractual obligations to, among other things, pay Draeger lease fees and return all customer records, data, and other reports as well as all Draeger BAIID devices.

B.    <u>Procedural History</u>

On January 10, 2011, Draeger commenced an arbitration proceeding with the American Arbitration Association against New Horizon seeking approximately $250,000 for New Horizon's breaches of the Agreement. <u>See</u> Draeger's Petition at ¶ 10. On January 18, 2011, Draeger revised its demand for arbitration to include a request for emergency arbitration to order New Horizon to return all customer records, data, and other equipment. <u>See</u> <u>Id.</u>

On January 24, 2011, an administrative conference call was held, but New Horizon failed to appear. On January 25, 2011, an emergency hearing was held before Arbitrator Sabater and New Horizon again failed to appear. During the hearing, Arbitrator Sabater established an emergency schedule to allow the parties to submit additional Memorials and Counter-Memorials. Pursuant to Arbitrator Sabater's Procedural Order No. 1 in Emergency

Proceedings, on January 27, 2011, Draeger submitted its Memorial in Support of Emergency Relief Application.  New Horizon did not submit a Counter-Memorial.

On February 1, 2011, Arbitrator Sabater issued a Interim Award for Emergency Relief in Draeger's favor.  Pursuant to the Award, New Horizon is required to; 1) return all customer records, data, and other reports to Draeger, 2) return all Draeger devices to Draeger, and 3) pay Draeger's attorneys fees and expenses associated with the emergency arbitration.  See Draeger's Petition at ¶¶ 13-14.

II.     **ARGUMENT**

A.     This Court Has Jurisdiction Over The Enforcement of the Arbitration Award

The Federal Arbitration Act (the "Act") calls for judicial enforcement of arbitration awards triggered by specific contract language.  Section 9 of the Act states:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.  If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

9 U.S.C. § 9.

The United States Supreme Court has held that this provision does not establish an exclusive forum for suits upon arbitral awards.  In Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co., 529 U.S. 193 (2000), the Supreme Court held that the venue provisions of the Act are permissive, permitting a motion to confirm, vacate or modify an arbitration award to be filed either where the award was made or in any district proper under this venue statute.  See Id. at 195.